Good morning. Good morning. You are Mr. Wilkerson? I am, your honor. You may proceed, sir. Thank you. May it please the court. Even giving Mr. Jackson every benefit, the record contains no proof beyond mere speculation to support either Judge Dawson's rejection of the Rule 50 motion at the end of his verdict at all. Mr. Jackson could not do his job. The best evidence of this is the medical record taken or provided January 31st, 2011, after he had reapplied not once but twice, and after the position had been passed over the first time, and two weeks before it was finally hired for on February 16th of 2011. In that medical record it says Mr. Jackson is, quote, currently unemployed as he is not able to perform his duties. He otherwise has no obstructive symptoms other than a hernia, which is why he went to the doctor that day, and is essentially without complaints other than not being able to work secondary to inability to pass a physical assessment. Now, that's pretty good evidence. Didn't his doctor release him to work? Partially. It was a return to work as tolerated. And in that medical record in which he was released, which was August 31st, 2010, the doctor said he was quite weak compared to his baseline, and his strength will improve as the months go on. So he was not able, he was not a full release, which the FMLA requires. FMLA has no partial releases. It is an all or nothing law in regards to reinstatement after you've taken your 12 weeks off because of the medical condition. To the hernia, which is why he was at the doctor's office that January, the hernia had begun while he was in the hospital for pancreatitis. On January 7th of 2011, he had a referral for a hernia. That was five days before the city posted the job a second time. Now, remember, he has a lifting requirement, which he said he cannot do. No caveats. Just I cannot do the lifting requirements of the job. The hernia, I suppose, is the reason for that. The hernia referral, the surgery was scheduled for February. I thought there was some evidence that he could do it with a forklift and hand lift and other people helping him, that sort of thing. That's not the caveat he provided at depositions, and the depositions was put forth in the trial. There's no caveat. He said I cannot do the lifting. You're right. He did talk about a forklift. In relation to the forklift, however, he was on four hydrocodone and four oxycodone a day. At trial, I asked him, do you think it would be safe to operate a forklift under that kind of medication? Well, I'm not sure is what he told me, or I don't know. I don't know. He didn't even at trial say that he could operate the forklift under the medication that he testified he needed, and still today, well, as of the day of the trial, still took. But the doctor released him to work knowing that he was on those drugs, right? Presumably. As tolerated, though. There's no evidence that the doctor knew what he did for a living at all. Mr. Jackson never testified that he told the doctor that I'm going to have to operate a forklift, that I'm going to have to weld, that I'm going to have to use a plasma cutter, that I'm going to have to use a lathe that will cut through four inches of steel. He never said that he told the doctor any of that. In fact, more to the point, when he told the city about his, quote, release to work, he never said it was as tolerated. He never mentioned the hernia. He never mentioned he was on medication. He never mentioned the neuropathy. He never mentioned any of it. Interesting point about the hernia, the day that the surgery was scheduled for was February 16th of 2011, the day the interviews were held for his open position. Now, to the welding machine, he operates some pretty heavy-duty equipment. I know Mr. Jackson will argue that there's no way you can get hurt by misoperating a welding machine, a lathe, or a plasma cutter. I think that's beyond the realm of logic. But even if it isn't, I asked Mr. Jackson, at trial, welding requires concentration. Yes. Welding requires a steady hand. Yes. Can you weld on oxycodone and hydrocodone? Well, I'm not sure. Even he can't articulate that he can do the job on this kind of medication, that he was still taking at the time of the trial. Final point, and I know Mr. Jackson will say that this is biased testimony, but the city has an obligation to protect its employees, not just Mr. Jackson, but other employees. And when you asked his boss, who, granted, is the one accused of retaliation, whether he would have allowed Mr. Jackson or any employee to operate this machinery, do any kind of lifting with hydrocodone, with oxycodone, with a hernia, Mr. Merriman says no. Setting Mr. Merriman aside because he is the alleged bad actor, Mike Foshay is the safety director for the city, in charge of implementing the safety procedures for the city. When you ask Mr. Foshay whether or not Mr. Jackson can do the job on this type of medication, he said, well, I wouldn't have let him. So the fact is Mr. Jackson cannot perform the duties of his job. And Judge Dawson noted that. At the end of the plaintiff's case, he noted, there's no evidentiary basis to find that the plaintiff could have performed the essential functions of the welder and machinist position when he applied for the position. Judge Dawson is absolutely correct. Judge Dawson, however, did not take it to its logical conclusion. And I made the point to Judge Dawson, I said, well, Your Honor, that element is the same for the ADA claim or rehab act claim as it is for the FMLA claim. He didn't extend it. That was the error. It should have been extended. If Judge Dawson has made a ruling that he cannot perform his duties, and if an element of the second claim is that he can perform his duties, then the second claim necessarily fails. Even assuming that Mr. Jackson, oh, one other point. Mr. Jackson has claimed that because he said at trial that, well, he's asked point blank, could you do your job October 2010, could you do your job January 2011, he said yes. That's the extent of the evidence and some evidence that he was able to chop wood two days before the trial. That's the evidence that he could do his job. That's not enough. In light of doctor's records, as this court has noted in Reynolds, as I've cited in the brief, a plaintiff's claim that he can do his job does not rebut medical evidence that he cannot. And even if we're sitting aside the medical evidence, he admitted to me, to the jury, that he didn't know if he could do his job. He admitted to me, he admitted to the jury, I cannot do the lifting requirements, without caveat. Now, assuming, however, that he could do his job, they have to prove a causal connection between determination or the- Let's go back to that. Yes. Because I think they argue that qualification is not an element of a retaliation claim. They do. What's your response to that? That it is, obviously. Well, one is it's the jury verdict. In a lot of our cases, we don't cite that as an element. Now, different kind of cases, generally, but- Different kind of cases. Not failure-to-hire cases. So are there failure-to-hire FMLA retaliation cases that have it as an element? Not in the Eighth Circuit. There's been no claim of failure-to-hire FMLA in this circuit. The Second Circuit, however, has clearly said that retaliation, failure-to-hire, is an element, is a qualification to do the job. The Fifth Circuit has talked about failure-to-hire retaliation in other contexts as having to have a qualification element. I think the Third Circuit put it the way I agree best with. They say that retaliation has those three elements, that Mr. Jackson asserts that they do. The second one is adverse employment action. But they say, how can you have an adverse employment action if the person wasn't even hireable? And that's the way they analyze this kind of case. And that's the way I think that it should be analyzed. This is a retaliation case. No doubt about it. If Mr. Gillum at trial admitted it's a failure-to-hire case. And the failure-to-hire elements clearly have an ability to do your job element. So it cuts against the grain of the Second, Third, Fifth, First, D.C., Tenth or Eleventh, I believe the Twelfth Circuits, to say that you do not have this element in a failure-to-hire case. And I'll say this too. So our cases that don't list it, your position is they don't list it because they're not failure-to-hire retaliation cases? Yes. Yes, Your Honor. And I'll make one more, two more points. Congress intended the FMLA to dovetail with the ADA. The ADA has a qualification element. Now, the FMLA doesn't have the exact same qualification element as the ADA does, but it does have the element that the only way you're entitled to reinstatement is that you're able to do your job upon the end of the 12 weeks. Now, so to me, what Mr. Jackson is asserting is that, well, granted, I wasn't entitled to reinstatement when my 12 weeks ended, but I was entitled to reinstatement three months later. But the fact that I couldn't do my job at the day that my 12 weeks ended matters for reinstatement, but it doesn't matter for failure-to-hire. To me, that's illogical. The FMLA requires you to be able to do your job. It protects you while you're not able to do your job. The Eighth Circuit, this court, I point to the Green case, which I cited in my brief. It's a First Amendment case. First Amendment cases are necessarily retaliation cases, just as Green was. Green was a First Amendment retaliation failure-to-hire case. In that case, this court said, you have to be able to say you can do your job. So that's a retaliation case that is a failure-to-hire case. Now, even assuming that he had established that he could do his job, the causal connection, there is none. In Kip v. Missouri Highways, this court has said that two-month interval necessarily eviscerates, or I'm not sure of the exact words, eviscerates any causal connection. Well, this is three-and-a-half months since the end of his FMLA leave, the first time that he wasn't hired. The second time he wasn't hired was a full eight months after he had ended his FMLA leave. Now, that eviscerates the temporal causation element. Now, granted, if they had evidence that Mr. Merriman or anybody with a city had said, that SOB was using FMLA leave and I'm not going to hire him, granted, that's direct evidence. That would change the concept here. You could sort of say something about using leave to get disability, that sort of thing, and then others found him to be the most qualified guy. True. I guess we'll just go to the reason why Mr. Merriman didn't want to hire him. You've got to remember when he was, quote, released to work, when Mr. Jackson came back to Randy Davis, his friend, his colleague for 10 years, he didn't tell Mr. Davis that he had any limitations or taken the oxycodone. But Mr. Davis and another individual went to Mr. Merriman's office to try to get Mr. Jackson's job back. Well, Mr. Merriman, being the rules guy that he is, he's been charged with changing the culture, changing the good old boy system of the city, of this department. He said, we can't just hire somebody back. We have to go through the procedures. Well, that was allowed to happen. But it didn't happen the way Mr. Merriman decided that it should have happened. The two people that went in to ask for Mr. Jackson's job back the first time were two of the same people that interviewed him. So to Mr. Merriman, this smelled rotten a little bit. Were the other people given a fair shot? Was the safety director involved in the meeting? No. It just didn't smell right to him. But that goes to the legitimate nondiscriminatory reason. And I'll skip to that real quick. That's the same reason Mr. Jackson heard he wasn't hired. He testified it was a trial. That's the reason I heard that the interview process wasn't done right. So even Mr. Jackson admits that that was the story he heard. So there's no evidence that Mr. Merriman lied about it. There's no evidence that Mr. Merriman hid anything. There's no evidence that retaliation was the actual point of all this. The disability claim, Your Honor, the word disability, dealt with whether or not Mr. Jackson was malingering or whether he wasn't malingering is the way I took it. Now, Mr. Merriman denies ever saying it, but even giving it its worst context, it was only a question of why Mr. Jackson is taking this much leave. And Mr. Merriman thought it was because he wanted to eventually get a disability. It's a fairly common thing I hear from time to time. I'm very close to my time, but I want to say one thing about causal connection before I leave here. Richardson versus Suggs, which is a very important case for my practice, says that even if you have a bad act, and in that case it was the athletic director for the University of Arkansas using the N-word in reference to black people, and then there was this whole thing about whether or not he intended it for Nolan Richardson, the basketball coach. And Judge Wilson in the Eighth Circuit agreed that that is some evidence of discrimination. But then Frank Broyles, the athletic director, and Nolan Richardson had a mutual admiration society meeting of sorts where they buried the hatchet, and the court said once that's happened, it's broken off. So even if the disability claim or the disability, use of that word, is some evidence of discrimination, the fact that we gave him 30 more days of leave when we didn't have to, after his FMLA leave was up, after we allegedly made that comment, the fact that we allowed him to get 240 more hours of time when we didn't have to, after the FMLA leave was up, after that alleged comment had been made, cuts off any potential causal connection. And I'll leave the last 58 seconds for rebuttal. Thank you, Your Honor. Mr. Gilliam? Good morning. Good morning, sir. May it please the Court, my name is Lucian Gilliam. I represent Mr. Jackson. First of all, qualification is not an element of a retaliation claim. There is a case, it's Evans v. Pugh, 902 F. 2nd 689 from the Eighth Circuit in 1990. It was an age discrimination retaliation-based type claim. They listed the three elements of a prima facie retaliation claim. Was it a failure to rehire case? It was a failure to hire case, yes, sir. And it specifically says qualification is not required. I mean, that seems very counterintuitive to me. Well, it says, it lists the three elements of a prima facie case for failure to hire and qualification is not in them. It did not specifically exclude them. Now, also, shaver versus. Doesn't it make sense that you have to be qualified for the job before there's a reasonable discriminatory inference? Well, I think there is an argument to be made for that, certainly. Now, having said that, there's four circuit courts of appeal that say that it is not an element of a retaliation claim. That's the Third Circuit in Krauss, the Sixth Circuit in Baker, the Tenth Circuit in Salenke, and one cited by the defendant was Ruggles from the Ninth Circuit,  The basis, the statutory basis for that is that the ADA and the Arkansas Civil Rights Act, which is really what this claim is, talk about otherwise qualified persons in the discrimination portions of the statute. But then when you're looking at the retaliation portions of the statute, that language is excluded. And, you know, quite frankly, a lot of people get hired for jobs that they are not qualified to do. There's no reason that a rule should be applied more strictly to people who have engaged in protected activities. Do you have any empirical basis to support the statement you just made? Just my experience in doing 14 years of employment discrimination law. It's just you see something you see on a fairly regular basis. For instance, if you look at after acquired evidence cases. But is it unreasonable to have a qualifications requirement? If it's in the statute, certainly. But it's not in the statute, and the Eighth Circuit has… I mean, it's a matter of economic life.  Well, I think, once again, that is something that occurs on a regular basis. In fact, it occurred in this case. Because in this case, my client was passed over. And keep in mind, they're claiming that they didn't know anything about him being unable to do the job until litigation proceeded in this case. But in this case, they hired him. My client was the unanimous recommendation of the first hiring committee. Then he didn't get the job. It was posted again three months later. My client, who had been first among 16, didn't even get an interview. Who did they interview? They interviewed people who did not know how to operate the machines that were in that shop. They hired somebody who did not know how to operate machines that were in that shop. They allegedly did this on the basis of, well, this guy has computer skills. But the fact is that computer skills were not listed on the job description as something that's necessary for that position. The fact is that they had no plans whatsoever to put computers in that shop. The fact is that they did not put computers in that shop. The fact is that man did not go in and perform that job and only lasted a few months. He didn't even last as long as six months. So let's go back to whether qualification is required. Are you familiar with the FMLA regs? Yes, sir. And for a reinstatement claim, don't they require that the person be qualified? For a reinstatement claim, yes. It is clear they do. That's 216. So doesn't it make sense? I mean, you know, failure to rehire, reinstatement, I mean, very close to each other. Well, I think there's a good reason for a difference here. A failure to hire, first of all, if you engaged in a protected activity under the FMLA, that does not necessarily mean that you yourself took FMLA leave. It could mean that you acted as a witness in a proceeding or told somebody, hey, go take FMLA leave, in which case the regulations that are in 216 regarding reinstatement in a rehire situation would not apply to you. And the other reason for that is that in a case brought under 216, if the employer does not reinstate somebody, they face a really onerous burden. If you don't reinstate somebody on their return from medical leave, the employer has to prove that they brought this person, didn't bring this person back for reasons not related to the FMLA. The burden of proof literally falls upon them. And so there is good reason in a reinstatement claim to require that, hey, you have got to be able to do this job. Plus it would interfere with the, it would probably let people go beyond their 12 weeks, which, as we know, you can't generally do under Wolverine. All right. Let's assume for a second that qualification is required, which I think is the way this case was instructed, right? Yes, sir. Yes, sir, it was. If it is required, can your client show that he was qualified since he was on hydrocodone and some other powerful drug? Yes, sir, he can. Yes, sir, he can. First of all, you know, my client's testimony. Operating these kind of machines? Yes, sir. Yes, sir. My client's testimony, which went in without objection, was that he did think that he could do, operate the machines under the influence of the medications. His testimony was the question, the bottle probably says drowsiness and can't operate heavy machinery or operate a motor vehicle, right? Answer, I believe it says do not operate machinery or equipment until you know how your body reacts to the medicine. Question, so can you operate all these machinery, these pieces of machinery, on 4-oxycontin a day? Yeah, I think I could. So that testimony went in without objection. The jury is entitled to rely upon it. If they wanted to object based on a medical conclusion or something like that, they could have done so. They did not. In fact, it was his own question. It was not my question. Now, the other thing is that if you look at the medical records, it doesn't say that he was taking literally 4-oxycontin a day. What the medical records say that he's prescribed up to 4-oxycontin a day PRN as needed, meaning that he's not always taking 4-oxycontin a day. Now, the questions that weren't asked of my client during this cross-examination were, you know, have you developed a tolerance? One thing the medical records reflect is that he had gone down from 10 milligrams of oxycontin in May, and he had been on them since January, to 5 milligrams when he was taking it in, you know, October. So he had gone down in his dose. The other issue is that this job was really not as dangerous as they're attempting to portray it. And this is one area that, for instance, this welding table that they talk about and the welding machine. I mean, you know, it can cut through steel. It sounds like it would be really dangerous. The reason it's not dangerous is that pieces of metal are put over there on that table. But my client is not at the table standing over welding. It's a programmed machine that welds on its own. He's just pressing buttons. He's not standing at the table. You know, when they have these lathes, for instance, that are grinding down metal, he's pressing buttons. He's not standing there holding something on a lathe going at thousands of revolutions per minute because he could not possibly do that no matter how healthy he was. So the thing about these machines is that he's not putting his hands in. He's not. I mean, he is literally standing at a foot pedal six feet away from these machines when they're operating. So the reality is is that they're not nearly as dangerous unless you're suicidal and willing to throw yourself on a table as has been portrayed. You know, if you look at my client's testimony, he stood up and described how those machines worked for 20 pages of testimony in front of a board about that size in front of the jury. And they had the opportunity to see how those machines worked, where things were, and understand that, yeah, this really isn't nearly as dangerous as they've been attempting to portray it. Meanwhile, testimony from them, the testimony from them about how this machine is dangerous. I mean, if you want to look at a conclusory, worthless, baseless statement, that's their testimony. Vicki Stoddard, she's an HR specialist. She doesn't know a thing about welding. Questioned Mr. Fauche, the safety gentleman, about these things when he tried to get up and claim they were dangerous. And he had to admit that, yeah, you wouldn't throw yourself over on the table. He had to admit that, yeah, I don't know what parts of those machines are. Mr. Merriman doesn't operate the machines. He's also demonstrated a bias against my client. So I think it is clear that my client could do that job. What about this plasma cutter? How close would your client come to that physically? The plasma cutter, he would be – hold on a moment. I'll be able to tell you. Well, it's not a big deal. Anyway, what about the requirements of taking measurements at a very precise level on the use of a lab? Does he have to do – does this operator have to do that, or does the machine do it by itself? The operator would need to take measurements, yes, sir. That's true. That's true. Does it require fine manual dexterity or not? To some degree. To some degree, yes, sir. But, you know, my clients testified that he was doing welding, that they actually brought him in to operate these machinery while he was on leave. So he did do that while he was on leave when they really needed him to. He also continued to weld after losing his job. So he's done these sorts of things. When he welds, that was interesting because he's not using an arc welder with holding a rod in his hand and welding like I did on the farm? No, that's what he's – now, at the shop, that is not what he's doing. At the shop, it's using large machines that are set up. But when he was welding on his own time after he lost his job, he was just welding on the farm using his hands. You may not think it's a good idea, but he's done it successfully for several years. He was chopping wood the day before trial. So, anyway, now I wanted to talk to you about the issue of intent as well. There's – let's start with timing. Now, timing is not a necessary element of proving intent in a case. It is an element that you can attempt to prove in a case. And the fact is that these jobs were put up in October and January. They couldn't have retaliated against him by not hiring him any sooner than that. So it's really – timing is simply not applicable to this situation. Well, it's a pretty subjective topic. Yes, sir. Yes, ma'am. And, you know, another issue is that, you know, my client has made out – you know, McDonnell Douglas versus Green, the issue is did they keep the position open and continue looking? And the answer is yes, they did. In Torgerson, when you're getting to a pre-step stage and you're needing to offer a comparator, you need to demonstrate that you're clearly more qualified. I forget the exact language, but it's generally that a reasonable jury would conclude that you're clearly more qualified, something to that effect. And the fact is, is my client had operated every one of those machines for 10 years. He was the unanimous choice of 16 people for the first round of interviews. The person hired, once again, did not have the ability to operate those machines, had no tracker record with them, and was hired supposedly based on something that's not in the job description. On the compensatory damages, you say that ACRA allows for those and you should have gotten those. You don't defend that ACRA doesn't support an FMLA claim. You, I think, try to make it a disability claim. And you say it goes – but the case wasn't submitted as a disability claim. Yes, sir, it was. Yes, sir, it was. Well, not the jury instructions I looked at. Well, it talked about medical leave in instruction number 1. That's an FMLA claim. Right, but it referenced back to instruction number 10. And instruction number 10 indicated, talked about medical leave under the FMLA and Arkansas Civil Rights Act. It doesn't mention disability. I have instruction 10 in front of me. It's an FMLA claim. But the reason it referenced the Arkansas Civil Rights Act is that medical leave is an accommodation, a reasonable accommodation for a disability. Yeah, but that's not the way the case was submitted. Well, Your Honor, I disagree with that. It strikes me as an ex post attempt to justify that. Okay, it is what it is. Well, Your Honor, the theory of the Arkansas Civil Rights Act case was that, and there is no question that leave can be a reasonable accommodation under the ADA. Leave can be a reasonable accommodation for a person with a disability. And my client took that leave. So you can pursue alternate theories where the same facts establish both theories. And at 253 to 255 of the transcript, the defendant is citing to saying that the Arkansas Civil Rights Act retaliation claim was dismissed. The court specifically says that after consideration by the court, the only issue for you to determine will be the plaintiff's retaliation claims under the Family Medical Leave Act and Arkansas Civil Rights Act of 1993. Then later on, at transcript pages 338, the defendant says, I understand that the Arkansas Civil Rights Act claim, I'm not sure if it's still before us. The court responded, it is. Instruction number 10 on the elements of retaliation failure hired stated, your verdict must be for the plaintiff on the plaintiff's retaliation claim under the Family Medical Leave Act and the Arkansas Civil Rights Act if. So clearly what was contemplated here by the jury instructions, by the court on motions for Jano V and DV was that there was a surviving Arkansas Civil Rights Act retaliation claim for accommodation in the form of medical leave. I see my time is up. Thank you. Mr. Wilkerson. The ADA case, ADEA case that Mr. Gillum mentioned at the very beginning was back in 1990, and it didn't talk about qualification because qualification was sort of inherent in that. Chambers v. Metro, even if it did say qualification was not element, which it didn't say, this court in Chambers v. Metro in an ADEA affiliated hire claim inserted the qualification element there clearly. As far as the oxycodone and hydrocodone and whether or not he was taking it versus being just prescribed it, if you look at the Joint Appendix 364 and every page around that, he was taking it. He was getting refills, actually refills more quickly than he was allowed and asking for special permission from the pharmacist and the doctor. As far as him saying that he could do his job on oxycodone and hydrocodone, I find that testimony is contradicted by his own testimony. When I asked him if he could weld, he said, I'm not sure. When I asked him if he could operate a forklift, I don't know. When I asked him if he could do the lifting, no. So even if crediting his testimony is not credible because it's contradicted himself. Of course, a doctor released him to work as tolerated knowing he was taking these drugs. But that assumes the doctor knew what he was doing, knew what Wayne Jackson's job was. And again, how did Judge Dawson, let's see, how did you preserve your record on this point? In other words, what did you ask Judge Dawson to do after the jury came back with his verdict? Extend his logic from the directed verdict after the plaintiff's stage. And then I filed a J&OB motion, a Rule 50 motion after trial. And so what really, what did the jury find from all this testimony as far as his ability to work? That he could perform the essential functions of his job. I understand it's a high burden, but I don't take this lightly. I mean, the evidence is pretty clear that he couldn't. Can I ask one other question? Yes. They also, there's a cross appeal that challenges the liquidated, the refusal to give liquidated damages based on a good faith finding. I saw no response in your brief. Are you conceding that point? No, I mentioned it in my original brief that that was actually evidence that we didn't have a bad intent and actually evidence that cuts against retaliation. I mean, the jury came back with a good faith verdict. The judge had within his discretion to give, to award liquidated damages. So no, I didn't concede it. I just, it was what it was. I have no argument to say. What was the evidence of good faith? I believe that there was no evidence that, well, one, there was no evidence of bad faith. And the good faith was that we gave him donated leave after his FMLA leave ended. We gave him 30 extra days after his FMLA leave ended. So, to be honest, I think the jury felt bad for the guy. And I don't blame that. I don't, I can understand that. But there was no evidence of retaliation. And the best evidence the jury felt there was no evidence of retaliation is the fact that they did, they thought that we did everything in good faith. Very well. The case is submitted. We will take it under consideration. We'll be in recess for a few minutes.